UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIELLE CREACY,

        Plaintiff,

    – against –

BCBG MAX AZRIA GROUP, LLC, LORD &
TAYLOR LLC, and LIXI PENG, a/k/a LEXI
PENG,

        Defendants.

**<u>OPINION AND ORDER</u>**

14 Civ. 10008 (ER)

Ramos, D.J.:

    Danielle Creacy ("Creacy") alleges that Defendant BCBG Max Azria Group, LLC

("BCBG")[1] subjected her to a racially hostile work environment in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("NYSHRL"), and

42 U.S.C. § 1981 ("Section 1981"), and denied her the use of a place of public accommodation

in violation of NYSHRL.  Before the Court is BCBG's motion for summary judgment seeking

dismissal of the Complaint in its entirety.  Doc. 53.  For the reasons stated below, BCBG's

motion is DENIED.

## I.  FACTUAL BACKGROUND[2]

    Creacy is an African-American female who was 28 years old in 2014.  *See* Pl.'s R. 56.1

Rsp. ¶ 1.  Creacy worked for BCBG, a clothing retailer with more than 651 retail stores

---

[1] Plaintiff also sued Lord & Taylor LLC ("Lord & Taylor" or "L&T") and the customer involved in the incidents, whom Creacy refers to as Lexi/Lixi Peng.  L&T and Plaintiff have entered into a stipulation of dismissal with prejudice of all claims filed against Lord & Taylor, and thus Lord & Taylor is no longer a party to the action.  Doc. 72.  Plaintiff has not been able to locate or effectuate service on Ms. Peng.

[2] The following facts are drawn from Defendant's Rule 56.1 Statement of Material Facts (Doc. 55) (Def.'s R. 56.1"), Plaintiff's Joint Local Rule 56.1 Statement (Doc. 62) ("Pl.'s R. 56.1 Rsp."), and the parties' supporting submissions.

worldwide, from July 2012 to April 2014.  *Id.* ¶¶ 3, 6, 78–79.  Some of BCBG's stores are standalone stores; others are "partner shops" located inside larger department stores.  *Id.*  In June 2012, Creacy began working as a part time stylist in BCBG's Greenwich, Connecticut store, where she outfitted customers and assisted the management staff.  *Id.* ¶ 6.  In March or April 2013, Creacy received a promotion and transferred to BCBG's store in Scarsdale, New York, which was located on the main floor of the Lord & Taylor store in the Vernon Hills Shopping Center.  *Id.* ¶¶ 11-12.

### A.   December 26, 2013 Encounter with Peng

On December 26, 2013, Creacy first encountered customer Lexi Peng ("Peng") at the Scarsdale store.  *Id.* ¶ 15.  At the time, Creacy was in charge of the BCBG shop within L&T and was working with sales associates Ashley Simon ("Simon") and Dejahne Johnson ("Johnson"), both of whom are also African-American.  *Id.*  Creacy was at the register speaking to Simon and Johnson when she heard Peng—an Asian woman in her 30s or 40s—yell "move" twice.  *Id.* ¶ 16. Creacy asked Peng if she was being helped.  *Id.* ¶ 17.  In response, Peng began yelling and Creacy could not make out everything Peng was saying.  Creacy then asked Peng to give her a second and turned back to face Simon and Johnson at the register.  *Id.*  Peng proceeded to elbow Creacy, stomp on her right foot, and yell comments such as:  "You people don't do this, you people don't do right  . . . What are you doing? . . . You people, you need to do this . . . Hurry up . . . Your job is to serve me . . . You can't be manager, your kind . . . You call security.  They are not going to do nothing for you people."  *Id.* ¶ 18.  At the same time, Peng pointed to the back of her own hand showing her skin, which Creacy understood to be a reference to Creacy's skin color.  Deposition of Danielle Creacy ("Creacy Dep.") (Doc. 66-1) at 81:8–12.  While Peng was

yelling these comments, she was also holding a clothing hanger in Creacy's face.  Pl.'s R. 56.1 Rsp. ¶ 18.

Creacy called Shannon O'Connell ("O'Connell"), L&T's loss prevention manager at the Scarsdale store, to ask for assistance.  *Id.* ¶ 19.  Creacy told O'Connell that Peng was "screaming" and asked her to remove Peng from the store.  *Id*. ¶ 22.  O'Connell called Jaime LaMorte ("LaMorte"), the manager for L&T's contemporary department, and asked her to go to the BCBG location and assess the situation until O'Connell arrived.  *Id.* ¶ 24.  When O'Connell arrived, she asked Peng to calm down because her tone was unacceptable and she was creating a scene.  *Id.* ¶ 26.  O'Connell told Peng that if she did not lower her voice, she would be asked to leave.  *Id.*

After the incident, O'Connell took Creacy and Simon to the stockroom where they discussed the events.  *Id.* ¶ 27.  In the stockroom, Creacy told O'Connell that Peng referred to her as "you people" and "your kind" and had a problem with her because she was a black manager.  Creacy Dep. at 96:3–97:4; Certification of Ashley Simon in Support of Charge of Discrimination ("Simon Cert.") (Doc. 66-10) ¶¶ 14, 16; *see also* Deposition of Shannon O'Connell ("O'Connell Dep.") (Doc. 66-5) at 96:25–97:17, 98:21–100:5.

As soon as Creacy left the stockroom, she called Jessica Ramirez ("Ramirez"), who was serving as the acting district manager.  Pl.'s R. 56.1 Rsp. ¶ 31.  Stephanie Walker ("Walker"), Creacy's direct supervisor at the time, was on vacation.  *Id.*  The parties dispute whether Creacy told Ramirez that the customer's aggression was potentially racially motivated.  Ramirez testified that Creacy told her that the customer was aggressive, but that she did not recall learning that the situation was racially charged.  Deposition of Jessica Ramirez ("Ramirez Dep.") (Doc. 66-3) at 42:23–43:9.  Creacy testified that she made it very clear to Ramirez that Peng hit her and

3

did not like her because she was a black manager.  Creacy Dep. at 106:5–9.  Creacy also testified

that Ramirez expressed shock that the customer was able to remain in the store and continue

shopping.  *Id.* at 106:11–12.

Ramirez advised Creacy to send her an email describing the incident, which Ramirez

forwarded to Rick Munoz ("Munoz") and Madeline Murray ("Murray").  Pl.'s R. 56.1 Rsp. ¶ 32.

At the time, Munoz was BCBG's loss prevention manager and Murray was a BCBG district

manager.  *Id.* ¶¶ 10, 32.  In her email to Ramirez, Creacy stated that the customer "was very

challenging and aggressive," put her hands on Creacy, and caused her to feel unsafe.  *Id.* ¶ 33;

Doc. 56-15.  The email made no reference to race, however.  *See* Doc. 56-15.  Munoz and

Murray never responded to Ramirez's email.  *See* Ramirez Dep. at 44:15-24; 49:8–11; 51:14–

52:4.

That same day, December 26, 2014, O'Connell also called Munoz about the incident and

advised him regarding Creacy's allegations—including that Peng struck Creacy and made racial

comments to her.  O'Connell Dep. at 127:16–128:12.  Munoz spoke with Creacy three days later,

claimed not to have received Ramirez's email, but assured Creacy that he would partner with

Murray, talk to O'Connell, and get back to Creacy.  Creacy Dep. at 118:20-119:6.  However,

Munoz did not contact Murray.  Deposition of Madeline Murray ("Murray Dep.") (Doc. 66-2) at

75:2–6; 103:7–104:7; 148:21–149:2.[3]  On December 28, 2014, when Walker returned from

vacation, Creacy told her about the incident with Peng, including that she believed Peng's

harassment was racially motivated.  Pl.'s R. 56.1 Rsp. ¶ 34; Simon Cert. ¶ 17 (noting Simon also

told Walker "it is because [Danielle] is black, that's why she got it").

---

[3] Creacy does not state whether Munoz coordinated with O'Connell as promised.

**B.      January 5, 2014 Encounter with Peng**

On January 5, 2014, Peng returned to the Scarsdale L&T store while Creacy was working.  Pl.'s R. 56.1 Rsp. ¶ 36.  Creacy was in the dressing room when a sales associate from L&T's denim department notified her that a customer wished to return BCBG merchandise.  *Id.* ¶ 37.  Creacy exited the dressing room to attend to the customer, but upon seeing that the customer was Peng, stopped and asked Peng to give her a moment.  *Id.* ¶ 38.  Creacy then proceeded to another register and called Zandra Smith ("Smith"), an African-American BCBG sales associate, but Smith was on her lunch break.  *Id.*  Creacy also called Noel Figueroa, an L&T security department employee, and asked him to come to the BCBG register.  *Id.* ¶ 39–40.  Meanwhile, Peng was saying things like:  "Hurry up.  This happened last time.  See, you people always make it hard for me.  You people always want to make it hard for me."  *Id.* ¶ 41.  Peng also called Creacy a "cunt" and said, "Oh you're afraid?  You feel scared?  You should be.  You people make it hard."  *Id.* ¶ 42.  Peng became even angrier when one item could not be processed.  *Id.* ¶ 45.  Creacy then saw Smith approaching and asked her to finish processing the return.  *Id.* ¶ 46.  When Peng's returns were processed, she left the BCBG register and went to another department in the store.  *Id.* ¶ 47.  Later, L&T's human resources manager Lorraine Mian ("Mian") approached Peng and told her not to return to the BCBG register or touch any employees.  *Id.* ¶¶ 48–49.  Creacy testified that Mian, after speaking with Peng, told her that the customer was still shopping and that if Peng came back over to the BCBG register, that Creacy should just go sit in the back.  Creacy Dep. at 168:11–14.  The following day, on January 6, 2014, Creacy texted a friend stating:

> [W]as told that when customer comes in I have to go to the stockroom [a]long with another black associate[.]  Had no support. Then customer came in again yesterday [t]alking shit shit trying to do a return… And my manager is so laxed [s]o I wanna take there [sic] right steps bc I will sue the shit out of them Bc I think it's a racial thing.

Pl.'s R. 56.1 Rsp. ¶ 51.

The next day, on January 7, 2014, Creacy sent an email to Ramirez, Murray, Walker, and Munoz expressing further concern about her encounters with Peng.  *Id.* ¶ 52.  She expressed concern for her safety and for the safety of her staff and wanted to know what the protocol should be if Peng returned.  *Id.*  She indicated that she did not want to have anxiety about carrying out her daily job responsibilities and did not want to be "embarrassed and harassed." Doc. 66-16 at BCBG0000228.  Her email made no mention of race or racial comments.  *Id.* Approximately one hour later, Walker responded to Creacy's email, letting her know that she had followed up with LaMorte and had tried following up with O'Connell.  Pl.'s R. 56.1 Rsp. ¶ 53.  She told Creacy: "We will make sure that you feel safe and supported…"  *Id.*

Murray forwarded the email to her supervisor, regional manager Billie Beck-Hammond ("Hammon"), and also wrote Walker and Ramirez that she emailed Hammond about the issue and that they should "wait for an answer from me before responding."  *See* Doc. 66-16 at BCBG000229.  In the email, Murray indicted she was not aware of the situation previously.  *Id.* Neither Walker nor Ramirez ever received an answer from Murray.  Ramirez Dep. at 48:3– 49:11; Deposition of Stephanie Walker ("Walker Dep.") (Doc. 66-4) at 43:6–22; 45:11–25.  In fact, Walker reached out to Murray multiple times about Creacy without getting a response from her.  Walker Dep. at 45:11–25.  Walker had also sought "a clear black-and- white" answer from L&T's loss prevention department as to L&T's and BCBG's respective responsibilities concerning the situation, but does not recall getting a clear answer and only got "a lot of passing the buck."  *Id.* at 40:5–41:1.  An individual from L&T's loss prevention department told her it was BCBG's responsibility to implement whatever procedures it felt necessary and that L&T would note it, but would only be able to follow up it if was something that they actually saw on

video.  *Id.* at 40:24–41:6.[4]  On January 29, 2014, Walker wrote Murray a follow up email,

asking:

> . . . I know this has been passed on multiple times, is there any way that you
> would be able to either speak to Danielle or provide me with any form of update
> on the situation?  I'm still trying to reassure her that she is safe and supported in
> the situation, but I know she is still waiting to hear something back from someone
> to know what to do in the future.

Doc. 66-18 at P16.  Murray never answered Walker's question.  Walker Dep. at 44:23-

45:25.

### C.   BCBG Human Resources Department

BCBG's corporate harassment policy provides that "BCBG prohibit[s] unlawful

harassment in any form," and that an associate who believes "he or she has been subjected to

harassment in the workplace" is to report the incident(s) to their supervisor or human resources,

at which point, the human resources department is to "undertake an immediate and objective

investigation of the employee's claims."  Declaration of Anne Buchanan in Support of Motion

for Summary Judgment ("Buchanan Declr."), Ex. A (Doc. 57-1).  On January 8, 2014, Creacy

called Megan Arcuri ("Arcuri"), the BCBG human resources official responsible for the region,

regarding the December 26 and January 5 incidents.  *See* Doc. 66-16 at BCBG000248–50.

Creacy testified that Arcuri assured her that she would get back to Creacy, but Arcuri never

followed up with her directly.  Creacy Dep. at 189:21–24; 193:6–9.

Subsequently on January 8, 2014, Creacy filed a police report with the Eastchester Police

Department.  Pl.'s R. 56.1 Rsp. ¶ 54; Doc. 56-17.  Creacy testified that she filed this report after

speaking with Arcuri earlier that day because she was frightened and nothing about the incident

was documented.  Pl.'s R. 56.1 Rsp. ¶ 54.  Creacy did not provide a copy of the police report to

---

[4] O'Connell testified that after the incident she reviewed the surveillance video, but the camera had not been focused on the BCBG register at the time, so there was no footage of the incident.  O'Connell Dep. (Doc. 56-3) at 111:3–21.

anyone at L&T or BCBG, but she told BCBG's human resources department that she filed it, and the police told her that they would follow up with the store. *Id.* ¶ 55.

On January 9, 2014 Arcuri emailed Munoz, Murray, and Hammond,[5] stating that Creacy had called her and was upset about the incidents with Peng. *Id.* ¶ 57. On January 10, 2014, Munoz responded with an email stating that he visited the store and spoke to Creacy and the L&T loss prevention team, and that the L&T loss prevention manager had committed to take follow-up steps. *Id.* ¶ 60; Doc. 66-16. In his email, Munoz also promised to speak with the general manager of the L&T Scarsdale store, Charles McGinness. *Id.* ¶ 60; Doc. 66-16. He did not, however. Deposition of Ricard Munoz ("Munoz Dep.") (Doc. 66-8) at 82:5-21.

### D.    Creacy Seeks Corrective Action

Creacy continued to raise her concerns with managers, and on January 30, 2014, contacted Hammond herself. Creacy Dep at 193:10–19. Hammond told Creacy that because she worked in an L&T store, BCBG did not control how the host store dealt with customers. *Id.* at 200:16–20.

Creacy also spoke with Joanne Ross, BCBG's vice president for the partner division, and asked several times during that conversation for Peng to be banned from the store. Pl.'s R. 56.1 Rsp. ¶ 70; Deposition of Joanne Ross ("Ross Dep.") (Doc. 66-6) at 79:22–81:1. At her deposition, Ross explained BCBG's role in safeguarding its partner shop employees. She stated that BCBG and L&T held "joint responsibility" for the security of partner store employees— such as Creacy—and that BCBG and L&T "work in partnership" to protect an employee harassed by a customer. Ross Dep. at 28:7-19; 40:12–17. Ross explained that if BCBG determines that a host store is not adequately protecting the BCBG employee, BCBG would

---

[5] At the time, Hammond was the Regional Manager and Murray's boss. *Id.* ¶ 58.

communicate with the host store at a corporate level and work directly with the corporate representatives. *Id.* at 42:5–43:15. In this case, Ross had previously worked approximately 12 years with Charlie McGuiness, L&T's general manager of the Scarsdale store. *Id.* at 73:14–74:2. Ross called McGuiness to say that Creacy was "very upset with the situation." *Id.* at 101:20–102:3. McGuiness replied that the store was handling the situation "appropriately" with loss prevention. *Id.* at 102:10–15. That was the extent of their conversation. *Id.* at 101:23–102:19. Additionally, Ross testified that Creacy did not tell her that Creacy believed the incident was racially motivated, but that if she had, Ross would have reported Creacy's complaint to human resources and the legal department "because of the severity of the allegation." *Id.* at 87:7–20. Creacy disputes this and maintains that she did tell Ross that Peng acted out of a racial bias. Beranbaum Declr., Ex. 12 ("EEOC Affidavit of Danielle Creacy") (Doc. 66-12) ¶ 67.

Creacy also repeatedly asked for a transfer. Specifically, she requested transfers in January and March 2014 and spoke to Walker, Ramirez, Hammond, and Ross about transferring from the Scarsdale store. Pl.'s R. 56.1 Rsp. ¶ 73. Walker testified that she spoke to Hammond about transferring Creacy, and Hammond said she did not have any open positions at a different store. *Id.* ¶ 74. Similarly, Hammond testified that she spoke to Creacy about transferring and informed her both that she could not transfer into a higher position and that there were no open positions in the Greenwich store, where Creacy potentially wanted to return. *Id.* ¶ 75. Creacy disputes the veracity of this statement, averring that the Greenwich store employee roster shows that there were vacant sales associate positions during this period and another sales associate was hired at the Greenwich store five days after Creacy ultimately resigned. *Id.* ¶ 75. However,

Creacy has not attached any of the relevant roster forms for the Court to determine the accuracy of her statements.[6]

### E.   Peng Returns to the Store

The next time Creacy saw Peng in the store was in March 2014.  *Id.* ¶ 61.  When Creacy saw her, she called Amy Werner, an L&T manager, and went back to the stockroom, as O'Connell had previously directed her to do in the event that Peng returned.  *Id.* ¶¶ 61–63.[7] Creacy stayed in the stockroom for approximately an hour while Peng shopped.  Creacy Dep. at 210:16–20.  She had no interaction with Peng that day.  *Id.* at 211:1–3.

### F.   Creacy Seeks Alternative Employment and Resigns from BCBG

On March 5, 2014, Creacy began seeking employment with other companies.  Pl.'s R. 56.1 Rsp. ¶ 76.[8]  Creacy claims she experienced physical distress and anxiety in connection with these incidents and BCBG's response.  Walker, her store manager, testified that "every day that [Creacy] worked, she . . . would be freaked out whenever an Asian woman came in, she was always on edge and was checking to make sure that it wasn't the customer coming back again." Walker Dep. at 44:2–7.  Creacy avers that she "loved [her] job" before the incidents, but that after she was "frightened" and "hated walking into the store."  EEOC Affidavit of Danielle Creacy ¶ 69.  She lost a lot of weight, cried all the time, and started seeing a counselor because of the stress.  *Id.*

---

[6] Creacy states that the rosters can be found at Doc. 66, Ex. 14 (Declaration of John Beranbaum), *see* Pl.'s R. 56.1 Rsp. ¶ 75, but Exhibit 14 is a Certification of Laura Antonucci and does not purport to contain any BCBG "employee rosters."

[7] Plaintiff also testified that after her second encounter with Peng, Mian and Figueroa also told her to go to the stockroom if Peng came back.  *Id.*

[8] Creacy first contacted an attorney in late March or early April, 2014.  *Id.* ¶ 77.

On April 19, 2014, Creacy received a job offer as a sales supervisor at a retail store in SoHo, New York.  Pl.'s R. 56.1 Rsp. ¶ 78.  That day, Creacy sent Murray an email, stating that she was resigning effective immediately from her position at BCBG "[d]ue to the emotional, mental and physical stress that I am under due to not having a safe and supported work environment."  *Id.* ¶ 79.  Creacy's resignation email did not mention race specifically.  *Id.* ¶ 80.

## II.   PROCEDURAL BACKGROUND

Creacy commenced this action on December 19, 2014.  *See* Complaint (Doc. 1).   Creacy alleges that Defendant subjected her to a racially hostile work environment, retaliated against her, and compelled her to quit ("constructive discharge") in violation of Title VII, Section 1981, and NYSHRL, and denied her the use of a place of public accommodation in violation of NYSHRL.  *See* Am. Compl. (Doc. 6)  On August 17, 2016, Creacy and BCBG stipulated to a dismissal with prejudice of Counts Four (Section 1981 – Retaliation), Five (Title VII – Retaliation), and Six (NYSHRL – Retaliation).  Doc. 67.  On October 14, 2016, Creacy and L&T also stipulated to dismissal with prejudice of all claims against L&T.  Doc. 72.  Thus, Creacy's remaining claims against BCBG are for:  (i) hostile work environment and constructive discharge in violation of Title VII, NYSHRL, and Section 1981; and (ii) denial of use for a place of public accommodation in violation of NYSHRL.  Defendant moves for summary judgment on all remaining counts, and also moves to dismiss Creacy's demand for punitive damages.  *See* Doc. 54 at 1.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno*

*v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *SCR Joint Venture L.P*, 559 F.3d at 137).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986)).  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable

to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

## IV.   DISCUSSION

### A.   Hostile Work Environment

The same standards govern hostile work environment claims under Title VII, Section 1981, and NYSHRL.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 587 (S.D.N.Y. 2011) (noting that "hostile work environment claims under the NYSHRL are treated the same as claims under federal law").

To establish a hostile work environment claim, "a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). Additionally, it is "axiomatic" that the mistreatment is only actionable when it occurs because of an employee's protected characteristic, such as race or national origin.  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).  A plaintiff must also demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Defendant argues it is entitled to summary judgment on the hostile work environment claims because the alleged conduct was not severe or pervasive and cannot be linked to racial animus, and because Peng's conduct cannot be imputed to BCBG.

1. **Existence of a Hostile Work Environment Because of a Protected Characteristic**

To determine whether a plaintiff has met the burden of establishing a hostile environment, courts should "examin[e] the totality of the circumstances, including:  the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (quotation marks omitted); *see also Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007). Moreover, the "test has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374 (quotation marks omitted).

While acknowledging that "the standard for establishing a hostile work environment is high," the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*'" *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir. 2004) (citing *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003)) (alteration and emphasis original).  "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.*

a. **Whether the Comments Were Racially Motivated**

Defendant further argues that Creacy has not demonstrated that Peng's comments were racially motivated and has made no concrete allegations to suggest that Peng's behavior—much

14

less BCBG's reaction to that behavior—was motivated by racial animus.  Defendant BCBG Max

Azria Group, LLC's Memorandum of Law in Support of its Motion for Summary Judgment

("Def.'s Mem. L.") (Doc. 54) at 14–15.  Defendant argues that the words Peng used did not

invoke race—but rather were ambiguous enough that they could be construed to reference

Creacy's role as a salesperson—not her membership in any protected category.  *Id.* at 15.

Specifically, Defendant argues that comments such as "your job is to serve me" and "this is what

you people do"—while crude—are nonetheless accurate descriptions of a sales person's job.  *Id.*

Defendant suggests a non-racist interpretation for the phrase "you people"—namely, that when

Peng said "you people" she was referring to the sales staff, not black people.  *Id.*

During Creacy's first interaction with Peng, Peng yelled comments such as:  "You people

don't do this, you people don't do right . . . You people, you need to do this . . . Your job is to

serve me . . . You can't be manager, your kind . . . You call security . . . They are not going to do

nothing for you people."  Peng also pointed to the skin on her hand, which Creacy interpreted as

a reference to her skin color.  During the second interaction, Peng stated, "See, you people

always make it hard for me.  You people always want to make it hard for me.  You people make

it hard."  Creacy argues that Peng's use of the terms "you people" and "your kind" in context

with the other statements demonstrate that she used these labels to classify Creacy as belonging

to an inferior group.  Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for

Summary Judgment ("Pl.'s Mem. L.") (Doc. 64) at 14–15.

Courts in this Circuit have held that a jury can reasonably interpret "you people" or "your

kind" as having a racial meaning.  *See Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 337 (E.D.N.Y.

2015) (listing cases).  The Court finds that there is enough evidence that a jury may construe the

comments Peng made to Creacy, including references to "you people" as referring to her race, as

opposed to her role as a salesperson.  *See, e.g.*, *Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 53 (S.D.N.Y. 2009) (where Defendant argued that the use of the phrase "you people" is ambiguous and not necessarily evidence of discrimination, the court held that questions as to the state of mind and discriminatory intent are for the jury); *Battle v. Carroll*, No. 11 Civ. 624S (WMS), 2014 WL 1679422, at *4 (W.D.N.Y. Apr. 28, 2014) (where defendants posited that "you people" referred to the housekeeping staff, not black people, the court held that the question of whether the term reflected racial bias was a matter for the jury).  It is the fact-finder's prerogative to reach its own conclusion whether these statements reflected racial bias.

### b.  Severity and Pervasiveness of Conduct

As to the frequency of the complained conduct, Defendant argues that Peng made the comments to Creacy on only two occasions.  Def.'s Mem. L. at 13.  As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).  Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment").  "But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."  *Alfano*, 294 F.3d at 374.  "In short, a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  *Id.* (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); *see also Richardson v. New York State Dep't of Correctional*

16

*Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) ("[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.") (internal quotation marks omitted).

The Court does not reiterate all the factual circumstances giving rise to Creacy's hostile work environment claim, but the allegations can be summarized as follows:  on two occasions, within approximately two weeks, Peng verbally assaulted—and on one occasion physically assaulted—Creacy while she was working.  Peng repeatedly referred to Creacy by language such as "you people" and "your kind."  Peng's comments also included language that was physically threatening, such as "Oh you're afraid?  You feel scared?  You should be."  There is no factual dispute that Peng's conduct interfered with Creacy's work—causing her, among other things, to retreat to a stockroom while the customer finished shopping.  BCBG argues that these circumstances are not severe or pervasive enough because it only happened twice.  Creacy argues that, when viewed collectively, the quantity and severity of the conduct and comments are sufficient to be deemed pervasive and damaging to her work environment.

Examining the circumstances in their totality, and weighing the nature, severity, and frequency of the conduct Creacy encountered, the Court finds that "[r]easonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee" and therefore "the potential for such disagreement renders summary judgment inappropriate."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000).  In *Whidbee v. Garzarelli Food Specialties, Inc.*, the Second Circuit reversed the district court's granting of summary judgment in part because one of the racially derogatory comments that was made over a span of two or three months was physically intimidating.  223 F.3d at 71.

17

The Court highlighted the aggressive nature of one of these comments, noting that "[a]t least one comment—[that] he had a rope with which to hang a co-worker—was physically threatening." *Id.* at 70–71. Review of Second Circuit jurisprudence in this area makes clear that when conduct in the workplace is physically threatening to an individual because of his membership in a protected class, that conduct is sufficient to create a hostile work environment. *See, e.g., Gregory v. Daly,* 243 F.3d 687, 693 (2d Cir. 2001) (holding that hostile work environment claim survived dismissal because of supervisor's "graphic references to sexual assault and women's vulnerability to it, and intimidating physical behavior"); *Cruz,* 202 F.3d at 571 (holding that a supervisor's "physically threatening" behavior of backing employee into a wall brought the "case over the line separating merely offensive or boorish conduct from actionable sexual harassment").

Drawing inferences in favor of Creacy, while it is true that she only interacted with Peng on two occasions, the encounters were severe and included physically threatening language. Indeed, Creacy even thought it was necessary to file a police report regarding the incidents. Thus, a reasonable jury may find that the severity of the conduct at issue, if proven, would be sufficient to establish a hostile work environment. Therefore, the Court DENIES Defendant's motion for summary judgment on the hostile work environment claims.

### c. Employer Liability

BCBG argues that its lack of control over Peng and over L&T's response to the alleged incident precludes liability against BCBG as an employer. In *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013), the Second Circuit endorsed the Equal Employment Opportunity

Commission rule for imputing employer liability for harassment by non-employees.  The Court stated:

> While this Circuit has not yet determined the standards for addressing harassment attributable to non-employees, we now adopt the well-reasoned rules of the Equal Employment Opportunity Commission ("EEOC") in imputing employer liability for harassment by non-employees according to the same standards for non-supervisory co-workers, with the qualification that we "will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees."

*Id.* (citing 29 C.F.R. § 1604.11(e) (2016)).  As is true for co-worker, non-supervisory harassment claims, in third-party harassment cases, "the employer will be held liable only for its own negligence," and the plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Id.* (citing *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted)).  In determining the appropriateness of an employer's response, courts look to whether the response was "immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior."  *Summa*, 708 F.3d at 124 (citing *Crist v. Focus Homes, Inc.,* 122 F.3d 1107, 1111 (8th Cir. 1997) (internal quotation marks omitted, alteration in original)).

In *Summa*, the Second Circuit affirmed dismissal of a sexual harassment claim that a female graduate student brought against a university, its head football coach, and its vice president of university relations.  *See id.*  The plaintiff was a team manager for the football team, and encountered a number of allegedly hostile comments about her appearance and sexual activities from members of the team.  *Id.* at 120–121.  Applying the rules regarding employer liability for third-party actions, the Second Circuit held that defendants had a "remedial obligation to address and end the harassment," and that they met their burden to do so.  *Id.* at

124.  The court noted that plaintiff did not complain of many incidents of harassment by the players, but when she did, each complaint "was dealt with quickly and in proportion to the level of seriousness of the event," and therefore concluded that the defendants took the appropriate remedial action.  *Id.* at 125.

Creacy provides several reasons to deny summary judgment on this issue.  First, she argues that a triable issue of fact exists with regards to whether BCBG's anti-harassment policy and complaint procedure provide an adequate avenue of complaint.  Pl.'s Mem. L. at 17-18. Specifically, Creacy argues that BCBG did not physically disseminate its anti-harassment policy, but only made the associate handbook available electronically, and furthermore did not train its employees in its anti-harassment policy.  *Id.* at 18.  Second, Creacy argues that BCBG failed to take prompt remedial action.  For example:  (i) BCBG supervisors did not report Creacy's complaints to the human resources department, contrary to company policy; (ii) BCBG did not undertake "a prompt and objective investigation" of Creacy's complaints, as required by company policy; and (iii) BCBG did not exercise reasonable care when its managers knew about the December 26, 2013 incident on that date, and yet allowed Peng to return to the store on January 5, 2014.  *Id.* at 19–20.

Here, it is undisputed that BCBG knew of Creacy's complaint regarding Peng the same day of Peng's visit and permitted her to return to the store again on January 5, 2014.  But BCBG argues that it took proper remedial steps by virtue of O'Connell's meeting with Creacy and her direction that Creacy remove herself from the sales floor if Peng returned.  Def.'s Mem. L. at 16-17.  BCBG also points to the following as evidence that it took the proper remedial steps:  (i) Creacy was able to contact her supervisor and L&T's security department to report her concerns; (ii) L&T's security department arrived at the site immediately after being called during both the

December and January incidents; and (iii) BCBG's loss prevention manager, Munoz, spoke with Creacy and L&T's loss prevention manager, O'Connell, about the situation.  Def.'s Mem. at 16-17.

Throughout its motion papers, BCBG also claims that Creacy was unable to articulate the action she wanted Defendant to take to assure her safety after the incidents.  *See* Def.'s Mem. L. at 17.  However, BCBG does not explain why this fact is legally relevant or why Creacy's failure to suggest remedial measures somehow relieves BCBG of its duty to take appropriate corrective action.  Moreover, BCBG is wrong that Creacy made no suggestions as to how to address the problem.  In fact, Creacy spoke with BCBG's regional manager, Hammond, along with other BCBG managers, about being transferred to the Greenwich store.  Creacy also spoke with Joanne Ross, BCBG's vice president for the partner division on March 21, 2014, and she described the two incidents to Ross and reiterated that she wanted the company to ban Peng from the store.

BCBG further argues that it had no control over Peng, who was an unknown third party, and that the company lacked authority to ban Peng from the L&T store.  The Second Circuit has held that employers can be liable for harassment by non-employees.  *See Summa*, 708 F.3d at 124.  In accordance with *Summa*, the Court considers the extent of BCBG's control of the location and its legal responsibilities with respect to the conduct of customers.  *Id.*  "Control, in the context of a retail establishment and an offending customer, is assessed based on the retailer's knowledge of the customer's prior behavior—thus, generally, an employer is not liable for failing to prevent an act of harassment by a first-time customer."  *Swiderski v. Urban Outfitters, Inc.*, No. 14 Civ.6307 (JPO), 2015 WL 3513088, at *3 (S.D.N.Y. June 4, 2015).  Here, Peng returned more than once to the store, causing a scene again on her second visit—and Creacy challenges whether BCBG's response to the customers' actions was appropriate.

BCBG avers that two witnesses have testified that BCBG did not have the authority to ban a customer from the L&T store. Defendant BCBG Maxazria Group, LLC's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Reply") (Doc. 68) at 4 (citing deposition testimony of Ross and Munoz). While it may be true that BCBG could not "ban" a customer from the store, when questioned about the relationship between L&T and BCBG regarding safeguarding employees, Ross stated that both stores held "joint responsibility" for the employees, and that if BCBG determines that the host store—in this case L&T—is not adequately protecting the BCBG employee, BCBG should communicate with L&T at a corporate level. Ross Dep. at 28:7-19; 40:12-17. In this case, Ross did call L&T's general manager of the Scarsdale store, McGuiness, and McGuiness replied that the store was handling the situation appropriately. *Id.* at 101:23–102:19. But Ross did not discuss banning Peng from the store with McGuiness. Ross Dep. at 100:11–23. However, it is true that L&T routinely issued "trespass warnings" to customers caught shoplifting and once issued a trespass warning to an individual who made threatening and harassing remarks. O'Connell Dep. at 57:23–59:4; 59:20–60:14. These trespass warnings had the effect of banning the customers from L&T for two years. *Id.* at 58:10–25. L&T had also physically removed customers who yelled or caused a disturbance. *Id.* at 56:7–57:7. There is no evidence that anyone at BCBG requested any such trespass warning to be issued to Peng.

This evidence, taken together, raises a triable issue of fact as to whether BCBG took proper corrective action and acquiesced in creating a hostile work environment for Creacy. Creacy sought assistance from several BCBG managers—including a corporate vice president— and a jury may disagree as to whether BCBG took reasonable care to remedy the harassment. Similarly, five managers knew about Creacy's claims, but none of them notified human

22

resources or worked with the department to conduct an investigation. Creacy testified that Arcuri, whom she contacted at the human resources department, never followed up with her regarding the incident and there is no evidence in the record before the Court that the human resources department undertook any investigation into the incidents, as required in the company's anti-harassment policy. Moreover, a dispute remains as to whether BCBG properly disseminated its harassment policy and trained its employees in proper harassment procedures and corrective actions. Finally, even if BCBG did not have the authority to ban a customer from L&T, a question of fact also remains as to whether BCBG's actions in failing to seek a trespass warning was a reasonable response to the situation. Therefore, it is for the jury to determine whether BCBG took appropriate and timely remedial action in light of the circumstances, including the level of control and legal responsibility that BCBG had.

\* \* \*

In sum, Creacy has offered sufficient evidence to permit a fact-finder to conclude that she suffered from a hostile work environment predicated on race-based animus and that liability should be imputed to BCBG. Therefore, the Court DENIES Defendant's motion with respect to the hostile work environment claim.

### B.     Constructive Discharge

BCBG argues that Creacy has failed to prove facts sufficient to show an intolerable work environment, much less one deliberately caused by BCBG. Def.'s Mem. L. at 22. Generally, to assert a constructive discharge claim, a plaintiff must show that "rather than discharging him directly, [his employer] intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 261 (S.D.N.Y. 2014) (quoting *Terry*, 336 F.3d at 151–152). Work conditions are "intolerable" if they are so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.  *Whidbee*, 223 F.3d at 73.

### 1.   Intentional Creation of an Intolerable Work Environment

Creacy argues that the Supreme Court's recent decision in *Green v. Brennan*, 136 S. Ct. 1769 (2016), makes clear that a constructive discharge claim does *not* require proof of intent on the part of the employer.  In *Green*, a black former Postal Service employee sued, alleging that the Postal Service retaliated against him after he made employment-discrimination claims, and as a result of this discrimination, he was constructively discharged.  136 S. Ct. at 1774–75.  The precise issue before the Supreme Court was when the limitations period begins to run under Title VII.  *Id.* at 1772.  *Green's* formulation of the requirements of a constructive discharge claim would appear to differ from the standard in the Second Circuit—which requires a showing of intent—stating that a claim for constructive discharge "comprises two basic elements: discriminatory conduct such that a reasonable employee would have felt compelled to resign and actual resignation."  *Compare Green*, 136 S. Ct. at 1772 (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004), *with Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.").[9]

_____

[9] As in *Green*, the Supreme Court previously held in *Suders* that to establish a claim of constructive discharge, a plaintiff must show not just that harassing behavior was "sufficiently severe or pervasive to alter the conditions of [her] employment," but also "that the abusive working environment became so intolerable that her resignation qualified as a fitting response."  *Suders*, 542 U.S. at 133–34.  *Suders* also did not directly concern the appropriate standard for analyzing a constructive discharge claim.  Instead, the Court addressed whether an affirmative defense to constructive discharge was available to defendant–to wit, whether the employer may defend by showing that it implemented a readily accessible and effective policy for reporting and resolving complaints of sexual harassment and that the plaintiff unreasonably failed to avail herself of that remedial apparatus.  *Id.* at 134.

In response, BCBG argues that the constructive discharge standard outlined in *Green* is dicta. *See* Def.'s Mem. L. at 14 ("The ruling in Green . . . focused on statute of limitations issues, not the substance of a constructive discharge claim.")  The Second Circuit in *Nugent v. St. Lukes–Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) has considered whether *Suders* removed the intent element from a constructive discharge claim.  In *Nugent*, the plaintiff argued, relying on *Suders*, that the Supreme Court removed the intent element for constructive discharge and adopted an objective test that looks only at whether a reasonable person in the employee's position would have felt compelled to resign.  *Id.*  The Second Circuit declined to decide the issue, and resolved the case on other grounds, noting, "even if [plaintiff] is correct that the Supreme Court has removed the intent element of the constructive discharge standard, [plaintiff] introduced insufficient evidence to survive summary judgment."  *Id.*  Following *Nugent*, the Second Circuit has continued to require the element of intent when considering constructive discharge claims.  *See, e.g., Serricchio*, 658 F.3d at 185 ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."); *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) ("A constructive discharge occurs when an employer intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.") (internal quotation marks and citations omitted); *see also Lisdahl v. Mayo Found.*, 633 F.3d 712, 719 (8th Cir. 2011) (noting "an intent requirement is implicit in the *Suders* test—the Court expressly described how the constructive discharge concept originated in the 1930's when the National Labor Relations Board developed the doctrine to address situations when employers deliberately forced

employees to resign by creating intolerable working conditions in retaliation for engaging in union activities").[10]

As discussed above, it is still the law that the Second Circuit requires a showing of intent in a constructive discharge claim.  Even under this higher intent-based standard, Creacy's claim survives summary judgment.  In any event, under the precedent that incorporates an intent analysis, the Second Circuit has not "expressly insisted on proof of [an employer's] specific intent" to force an employee to quit to demonstrate constructive discharge; rather a plaintiff needs to "at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'"  *Petrosino*, 385 F.3d at 229–30 (quoting *Whidbee*, 223 F.3d at 74). Therefore, applying this analysis, a plaintiff need only establish for the first part of the constructive-discharge test that there remains a genuine issue of material fact as to whether a defendant acted deliberately in engaging in conduct that created the workplace conditions at issue and "need not demonstrate that [BCBG] specifically intended for [Creacy] to quit."  *Corfey v. Rainbow Diner of Danbury*, 746 F. Supp. 2d 420, 429 (D. Conn. 2010).

Here, there is evidence that BCBG deliberately failed to take actions calculated to remediate the workplace conditions to which Creacy was subjected, including failing to ban Peng from the store and failing to investigate the incidents as required by its policy.  Indeed, while BCBG asserts that Creacy did not inform them of the racial basis for the attack, there is ample evidence in the record that she did make them aware of the racial nature of the incidents, and that Ross—a corporate vice president—acknowledged that a racial incident would have been sufficiently serious to escalate the investigation.  Therefore, though it is a close case, the Court

---

[10] Even after *Suders*, it is still the case that a Circuit split exists regarding whether to impose the additional requirement that a plaintiff establish that his employer created the intolerable conditions with the intent to cause the employee to resign.  *See Poland v. Chertoff*, 494 F.3d 1174, 1184 n.7 (9th Cir. 2007) (comparing cases).

finds a genuine issue of material fact exists as to whether BCBG acted deliberately in creating an intolerable work environment.  *See id.* (holding that a genuine issue of material fact exists as to whether the Defendants acted deliberately in "affirmatively deciding not to investigate or reprimand [the harasser]"); *Polidori v. Societe Generale Groupe*, 39 A.D.3d 404, 406, 835 N.Y.S.2d 80 (2007) (employer may demonstrate that it did not deliberately create intolerable working conditions by showing that it investigated an employee's complaints and offered her reasonable options for returning to work).

### 2.   Forced To Involuntarily Resign

BCBG argues the mere fact that Creacy was unhappy at BCBG, including the incidents with Peng, does not entitle her to a claim of constructive discharge.  Def.'s Mem. L. at 22. Here, the Court finds that Creacy has provided sufficient evidence at this stage that the conditions were intolerable enough that a reasonable person in her shoes may have felt compelled to resign.  A reasonable employee may have felt compelled to quit her job if a customer was repeatedly allowed to berate her and she felt the company was not investigating the situation or doing enough to protect her wellbeing, especially after the first incident when she was physically assaulted.  While Creacy raised the issue up the corporate ladder and affirmatively sought investigation and protection, a material issue of fact remains as to whether BCBG's response was so lacking that it caused Creacy to feel compelled to resign.  The Court therefore DENIES BCBG's motion with respect to constructive discharge.

### C.   Public Accommodations Under NYSHRL

While Defendant purportedly seeks summary judgment on all claims, it did not contest Creacy's public accommodations claim under NYSHRL § 296 in its memorandum of law or

reply memorandum.  Therefore, the Court DENIES Defendant's motion for summary judgment with respect to the public accommodations claim.

### D.        Creacy's Request for Punitive Damages

BCBG also argues that Creacy is not entitled to punitive damages because she has alleged no facts to suggest that BCBG acted with malice or reckless indifference.

Under Title VII and § 1981, punitive damages are limited "to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1) (2012)); *see also Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 75 (E.D.N.Y. 2002), *aff'd*, 93 F. App'x 260 (2d Cir. 2004) (noting punitive damages can be recovered under both Title VII and § 1981).[11]  Malice and reckless indifference refer to "'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'"  *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 101 (2d Cir. 2001) (quoting *Kolstad*, 527 U.S. at 535).  A "positive element of conscious wrongdoing" is required for an award of punitive damages.  *Kolstad*, 527 U.S. at 538 (quoting C. McCormick, Law of Damages 280 (1935)).

BCBG argues that it has a comprehensive equal employment opportunity policy that it tries in good faith to enforce, and that the record shows that multiple employees took the time to speak with Creacy about her concerns and made suggestions on how to remain safe if Peng returned.  BCBG cites three cases for its proposition that punitive damages should be dismissed.  *See* Def.'s Mem. L. at 22-23.  However, each of these cases considered the propriety of a

---

[11] Creacy's claims for punitive damages arise only under Title VII and § 1981, as "punitive damages are not available under [New York's] human rights law."  *Chauca v. Abraham*, 841 F.3d 86, 95 (2d Cir.), *as amended* (Nov. 8, 2016), *certified question accepted*, 28 N.Y.3d 1108, 68 N.E.3d 76 (2016).

punitive damages award following a trial, not at the summary judgment stage.  *See Wiercinski v. Mangia 57, Inc*., 787 F.3d 106, 115 (2d Cir. 2015) (affirming post-trial ruling to the extent it vacated punitive damages award); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 573 (2d Cir. 2011) (after jury award of punitive damages, noting that "[e]ven where a plaintiff establishes malice or reckless indifference, a corporate defendant may still avail itself of an affirmative defense."); *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 151 (S.D.N.Y. 2003) ("At the close of [plaintiff's] case-in-chief, Defendants moved for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(a), on various issues, including punitive damages, arguing that [plaintiff] had not presented sufficient evidence to warrant a jury award of punitive damages."). BCBG cites to no authority to suggest a granting of summary judgment on the punitive damages award is appropriate under similar circumstances to the case at bar.

Here, there is sufficient evidence for the jury to consider whether BCBG acted in the face of a perceived risk that its failure to investigate Creacy's complaints of racial harassment violated federal law.  BCBG has 651 stores worldwide, and what it calls its "comprehensive" equal employment opportunity and anti-harassment policy.  Pl.'s R. 56.1 Rsp. ¶ 4.  Thus, if it did fail to properly investigate Creacy's complaints, it was a sophisticated corporation with anti-harassment and discrimination policies in place such that it understood that its actions could run the risk of violating federal law.  *See Hill*, 212 F. Supp. 2d at 76 (holding jury could reasonably infer that defendant's managers knew their actions violated federal law by virtue of well-established Supreme Court discrimination and retaliation case law, long standing statutory prohibition against such conduct, the company's size, and "the common knowledge in today's society that employment discrimination is impermissible.")  Therefore, the Court DENIES BCBG's request to dismiss Creacy's demand for punitive damages at this juncture.

## V.      CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is DENIED.

The parties are directed to appear for a status conference on **April 26, 2017 at 11:30 AM.**  The

Clerk of the Court is respectfully directed to terminate the motion, Doc. 53.

It is SO ORDERED.

Dated:      March 31, 2016
            New York, New York

Edgardo Ramos, U.S.D.J.